181470 Michael Makarya-Zakira v. William P. Barr Good morning, Your Honors, Justice Souter. May it please the Court, I am John Muskoka for Mr. Zakariya. I would like to reserve three minutes for rebuttal. We ask the Court to grant our petition and vacate the BIA Board of Immigration Appeals orders for two basic reasons. First, we believe the political opinion analysis of the agency is missing any express finding on his political asylum claim and to the extent it makes one, that he fears generalized violence, that that is manifestly contrary to the record, the administrative record in this case, which shows a very specific, well-founded fear, backed up by the agency's own findings about the persecutor, al-Shabaab. Second, with regard to the agency's particular social group or PSG finding, we ask the Court to vacate and remand because it is fatally flawed. Their analysis of the social group actually never occurs in full. Not once do they analyze the full westernized, Americanized, Christian Kenyan opposed to al-Shabaab. Rather, they analyze various components of it and indeed, in one case, a group involving Kenyan women that has nothing to do with our case. But, yes, they misspoke and then didn't you move to reopen? Thank you. You, generically, I don't know if you've been counsel throughout this, and they said, well, yes, we made a mistake about that, but it doesn't matter to the outcome of our opinion. With respect to the women group, yes, that's true, but they struck the whole paragraph. They said, we stated, and then they said, we withdraw that statement, and in its place, they never fully repaired the damage from the first decision. The second decision from the BIA in April of 2018. Okay, well, let's just drop that out of the case and proceed with your argument. So, with regard, nowhere in the record does the board or the respondents decide, explain why his fear is of generalized violence. My client has throughout stated the very specific reasons that he would be targeted, not violence as a whole, as a Kenya violence issue, civil unrest, but targeted at his specific beliefs and his specific traits. Counsel, in the proceedings below, in papers that your office filed in decisions of the BIA, there's reference to a pattern or practice claim. In your brief here, I don't find any explicit reference to a pattern or practice claim. Have you abandoned that claim? No, we have not, Your Honor. Where do you articulate it in your brief? The brief could be more thorough on that point. You're right. We submit that the particular social group and the political opinion characteristics are targeted as a group. The practice, he belongs to the group and the group is targeted in his country. And it's sufficient to establish a pattern of practice. But that is not our main thrust. It's the reason it's not central in the brief. The BIA basically says, look, he's got a large family. They are Christians. They are back in the home country. They go to church. They've not been harmed. So that defeats his claim that his fear of going back is at least an objectively reasonable fear. And that seems to more or less avoid the issues that you're trying to raise here. Would you like to argue to us about that?  With respect, the Christian Kenyans that his family also, as you point out, belong to that group, that's not the entirety of the group that he's asserting. His demonstrated American characteristics, that is, living here for now 14 years, three American children, and his political beliefs in support of the Kenyan policy with regard to al-Shabaab, those are all characteristics his family don't have, don't share. Okay, so the claim is not just Christians are sought out, but someone returning from America who is Christian would be subject to persecution? Westernized or Americanized Christian Kenyans, and the westernized and Americanized in this case, it's not part of our definition of the social group, but in this case, the way we meet that definition and that inclusion in the group is his 14 years in the U.S., is his three American citizen children, and other Americanized traits that he brings back, having been here for so long. But all of these characteristics are ones his family... And wouldn't you make the same claim whether he has children or not? I'm not sure what that has to do with anything. Well, it's part of the reason, it's part of both claims, the political opinion, the social group. It's part of the social group case in the sense that that helps to define him and his group. And so in coming in from many years away with American children, children named Christian, in fact, one of them is, that group is broader than just the Kenyan Christians that the board adjudicated. Nowhere does the board adjudicate the actual group that this client has presented to the agency and now to this court. So you're basically making a kind of synergy argument. There is enough on the record under each of the categories of asylum grant, together with his personal history of a period of time in the United States with children, and if you consider them not distinctly, but as part of a whole, it raises a claim of fear that is not merely the sum of the parts of the distinct underlying categories. Is that basically your argument? That is correct, although I don't mean to say that we don't fully meet the definition of protection under the political opinion ground or the social group ground. But the fear that you reference, yes, it is the sum of its parts. But he has, in our view, specifically developed the political opinion claim and the social group claim, and more to the point, the agency has not really fully reviewed either one. And again, I don't want to repeat, but on the political opinion claim, the court simply went straight to the position that generalized violent civil unrest is not grounds for asylum without analyzing what he actually brought to the table in his political opinion. I'd like to follow up on Justice Souter's question. Thank you. You're saying one plus one gives us a unique combination, which the BIA had to respond to, one being returning American plus Christian, returning from America plus Christian, America or westernized. But if the BIA rejects your number two, doesn't the whole equation just fall apart? If they haven't analyzed the entire social group presented, they're violating their very own precedent. No, no, no. The implicit reasoning would be, look, if there is really no risk to Christians, the mere fact that he's returning from America, which you put together with Christians, doesn't give you the type of protection that you think you're entitled to. Thank you. But they didn't rule that Christians alone are not being harmed. They're specifically saying that 82% of the country is Christians. I don't know if that's even true. But they only analyzed that part, and they have not analyzed the full characteristics that make up our social group. So if it's true that the Christian 82% majority is not harmed, no, that doesn't derail the entire social group. So what are you left with, returning westerners? An Americanized or westernized person returning who has these political opinions, which he has demonstrated. Then that just comes down to your political opinion claim, right? Which we believe is sufficient in this case. Yes. May I go back to that? No, I was just going to ask you, maybe I've just forgotten, but what is the demonstration that he has made of his political opinion? So he has not been active politically in the sense of being a member of a party or a speaker. He has stated his views. He's been credited with having those views. That's undisputed in the record below. Where has he stated them? He's only stated them in this record. What we have argued is that the other characteristics of his claim, that is his presentation as a person with the American ties, with the Christian religion, puts him in a category of people who could be viewed, not necessarily, but could be viewed as opposed to Al-Shabaab. And the very type of people in universities, in upscale malls, in resort towns, were targeted specifically for those reasons. And so, no, he doesn't have a political resume. That's not our claim. Okay. I think you've reserved some time. Thank you. You're welcome. Good morning, Your Honors. My name is Sharon Clay. Speak up, please. My name is Sharon Clay, and I'm here on behalf of the government. Okay. Our contention is that Petitioner has not presented any evidence that would compel this court to conclude that he has a well-founded fear of persecution in Kenya. Based on the facts as presented in this case, Petitioner's fear of harm is exactly on generalized violence in Kenya. In fact, it was his words that the Al-Shabaab terrorist group actually attacks everybody except Muslims. There's no evidence in the record that shows that Christians were highlighted or attacked any different than any other group of people in Kenya. Well, what about the example that he gives of a terrorist attack in which the people who were sort of rounded up in it by the terrorists were allowed to go free if they could recite from the Koran, whereas those who could not, i.e., among others, Christians, were not released? There is at least one example. Yes, but we would argue that one single incident would not be sufficient to establish his fears objectively reasonable. And there was more than one? Well, there were several, but they're also isolated in particular regions. Why are you pitching your argument to Christians aren't singled out? No, the Christians are singled out to some degree, but they're actually, the Christians that are being harmed are in majority Muslim districts. If you read the documents in the record, he doesn't target Christian majority districts, he actually targets Muslim majority districts near the border of Somalia. So they're essentially sort of, when you look at their focus, their focus is not as much on Christians per se, it's almost as if Christians cannot get out of the way, sort of. They're in the region and they do get targeted, but they're not the only ones. And their harm is not just distinct to themselves. Like I said, it's all non-Muslims, and non-Muslims can include the Buddhists that are in their region. It could also include other Muslims that can't cite from the Koran. There's no evidence in this record that Muslims themselves have not actually been harmed in this record. And because he's not able to articulate anything other than what the country condition evidence are, we find that the evidence is insufficient to establish that only Christians are targeted. Counsel, your opponent said, in response to my question, about is there a pattern or practice claim, he said, well it's not our foremost claim, but it's still here. Do you think it's still here? Yes, I do. The board did decide on it. The immigration judge concluded that the... There are two separate questions. One is whether the agency said anything about it. And you were beginning to answer sort of in those terms. But there's a separate question of whether his briefing on appeal is sufficient to permit him to raise the issue now. There's not a lot in the briefing about this, and there is the doctrine of appellate waiver, because you've decided not to brief something. Correct. The board is the body that actually took up the pattern or practice of persecution. I'm asking about the appellate waiver. Do you have a position on that one way or the other? Yes, we do believe that the board has the right to waive the particular social group case. The board actually cited to a case, that's a 2018 case, which relied on a matter of AT that said that the board, having been an appellate body, has the discretion to not review claims that have not been raised before the immigration judge. And in this particular case, the pattern or practice claim was not raised before. I'm still not sure. For example, in the board's decision on the motion for reconsideration, they talk about a pattern or practice claim. They address it. My question is, is that issue now before us? Has that pattern or practice claim been raised by the appellate? What is your position? Is it here or is it not? In our court. Before this court, I don't think the petitioner has sufficiently raised the pattern or practice argument. He did raise an 82% question about size or something, but he didn't articulate any legal support for it. If that claim was before us, it would very much change the nature of the analysis, would it not? I mean, the suggestion that he would have to establish a reasonable fear that he would be individually targeted, that's not what a pattern or practice claim is all about. Do you agree? I agree. That's an individualized claim. But he hasn't stated any particular facts that could show that he has any particular risk as an individual Christian, because 82% of the population is actually Christian. And that's probably why his stronger argument might have been pattern or practice. However, as the board noted, the attacks are not systematic. They're not pervasive. They're not organized. They're not organized? When he described the incident that Justice Souter was referring to, that attack in the mall was highly organized. I mean, they were systematic, very organized in determining who was Christian and who was not. True, but they were rather isolated and sort of more random. The two major attacks that occurred, occurred two years apart. And all the other attacks that appeared to be in the country condition reports are in the northeastern and coastal areas. The central part of the region doesn't have the experiences of these particular attacks. The only place in central Kenya that does experience any attacks is Isle, which they mentioned in Nairobi. The record actually shows that he lives 160 kilometers away from Nairobi. So his parents have fortunately not been subjected to these acts of terrorist harm, because they are kind of remote from where the activity has taken place. Again, there hasn't been anything in the record that shows that. As a matter of fact, if you do an actual search for the city that he lives in, Nakuru, there's absolutely no attacks that have occurred in that particular city or close by except for Nairobi, which is 160 kilometers away. Nakuru actually appears in the record in two places. In the one place it's identified, it refers to workers' rights. And in another place in the country condition evidence, it appears as a, they talk about a community organization or a community network group. So it's not been affiliated in any of the country condition evidence as a place where any of their residents have been harmed. And we would submit that if attacks are only in one particular place and not completely widespread or all throughout Kenya, then unless he can show some particular reason why he would be singled out under these isolated attack positions that he hasn't made up his case for asylum. One of the things I did want to go through before, is that the petitioner makes the point that the case is wrong for being based on generalized violence. But as noted before, the violence that has taken place in Kenya is not specific. I mean, everybody is kind of subject, and these particular regions are subject to harm. The particular social group playing the board's prerogative of discretion in Nairobi, not actually addressing the newly articulated claim. We would submit that the board does have discretion to do that. But on this record, the board appears to have decided to do the one plus one analysis that the court has decided. And based on this court, not this court, but the precedent here in the First Circuit, it's already been decided that applying westernized or Americanized to anything is too vague to actually establish a specific, this is too vague to be able to delineate the persons who are defined within the group. That said, if you combine the articulated particular social group claim that the immigration judge actually pitched, and you combined his Christianity and his political opinion decision, what we would say is that even combining all three of those things together, it wouldn't change the calculus. The group would still not have proper particularity or the social distinction to qualify for a grant of asylum. There's been no evidence in the record to show that Kenyans would perceive that group as a distinct group within Kenya, and there's, like I said, there's no way to know who actually would fall within the group, because there's no description of what's considered westernized or what's considered Americanized. I mean, it could be your speech, it could be your clothes, it could be, you know, cultural norms. But without knowing what those things are, we don't really know which Christians with what political opinions would fit within this particular group. And if there are no further questions. Thank you. Thank you. In Ribello, I would just note that the record does show that State Department travel warnings, three different places in the record very clearly identify American and western interests or targets for the harm. They very specifically talk about places of worship, not any particular faith. The characteristics that my client shares are specifically documented in the record, and I believe that goes to the social distinction component of the PSG analysis that he has asserted, but I will still go back to the fact that I don't think we've ever seen a decision on the social group that has been asserted. I think that's a legal failure that calls for a remand. Are the State Department warnings in the record? Yes, they are, Justice. May I give the citation to them? If you can find it, or you could send a letter afterwards. One moment. In the administrative record 167 to 168, 214 to 215, 335 to 337, and on page 366 of the record, the Embassy of the United States warns of attacks throughout Kenya. And on the geographical point, I would just note that it's not attacks in just one place. Nkuru is not far from Nairobi. That's in the testimony. Nairobi is in the central province. Nairobi is one of the most horrific. It's hard to order them. The Westgate Mall attack was. Garissa is northeast. The quarry was somewhere else. The coastal areas, it's a big coast, and there's quite a few different incidents, a different one. But it's in the record. I'll leave it at that. Thank you.